Donald McGUIRE, Plaintiff,

v.

LYKES BROS. STEAMSHIP CO., INC., Defendant and Third-Party Plaintiff.

HANSEN SEAWAY SERVICE, LTD., Defendant,

v.

DAWES RIGGING AND CRANE SERVICE, INC., and Thomas H. Freckmann and Joseph Crivello, Third-Party Defendants,

and

Advance Boiler and Tank Company, Additional Third-Party Defendant.

Case No. 76–C–85.

United States District Court, E. D. Wisconsin.

June 22, 1978.

James P. Brennan, Milwaukee, Wis., for third party defendants Dawes Rigging and Crane Service, Inc., Thomas H. Freckmann, and Joseph Crivello.

Stanley F. Schellinger, Milwaukee, Wis., for additional third party defendant Advance Boiler and Tank Co.

John C. Sands, Chicago, Ill., David M. Quale, Milwaukee, Wis., for plaintiff.

Ben G. Slater, Milwaukee, Wis., for defendant Lykes Bros. Steamship Co., Inc.

Harney B. Stover, Jr., Milwaukee, Wis., for defendant Hansen Seaway Service, Ltd.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is a maritime personal injury action arising under 33 U.S.C. §§ 901–905. The plaintiff Donald McGuire was injured on October 8, 1975, when he fell from a ladder into the hold of a ship on which he was engaged in lashing cargo. The defendant Lykes Bros. Steamship Co., Inc., ("Lykes") is the owner of the ship in question. The defendant Hansen Seaway Service, Ltd., ("Hansen") is a stevedore company hired by the defendant Lykes to load cargo onto the ship. Third party defendant Dawes Rigging and Crane Service, Inc., ("Dawes"), plaintiff's employer, was hired by Hansen to assist in lashing the cargo. The additional third party defendant Advance Boiler and Tank Company, ("Advance") was hired by Lykes to make repairs on the ship and was engaged in so doing at the time of the accident.

Lykes filed a third party complaint against Advance on May 27, 1977, for contribution or indemnification in the event that Lykes is found liable to the plaintiff, asserting that advance breached its warranty or workmanlike service to Lykes in failing to repair the ladder from which plaintiff fell in a timely manner, and further asserting that Advance was negligent in the performance of its work and in failing to post warning signs by the ladder in question or to take other measures to prevent access to the ladder. Advance has moved for summary judgment. For the reasons hereafter stated, the motion will be denied.

From the pleadings and papers filed herein, it appears that Lykes contracted with Advance on October 2, 1975, to perform repairs to the ship S.S. Jean Lykes when it docked in Milwaukee, Wisconsin, on October 8, 1975. Advance was given a list of items in need of repair on the morning of October 8 when it commenced work on the ship, and additional items were included in the course of the morning, although not put onto the written list. Among those items was the ladder in hatch No. 2 from which the plaintiff fell at approximately eleven o'clock A.M. At that time, Advance asserts, it was engaged in completing other repairs, and had not yet had time to work on the ladder in question. It also asserts that it did not have effective control over the area in which the injury occurred at the time that it occurred, and therefore had no duty either to warn persons in plaintiff's position of the defective condition of the ladder or to take precautionary measures to prevent injury.

Prior to the amendment of Title 33 U.S.C., in 1972, a shipowner had been considered to be strictly liable for injuries to longshoremen which occurred on shipboard, on the theory that the shipowner had a continuing duty to provide longshoremen with a reasonably safe place to work. In 1972, 33 U.S.C. § 905 was amended to provide in part:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. * * *. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. * * *."

Whereas even prior to the 1972 amendments, a shipowner could recover under a contract theory from a third party which breached its warranty of workmanlike service, see, e. g., *Delaneuville, Jr. v. Simonsen, Jr.,* 437 F.2d 597 (5th Cir. 1971); *H & H Ship Service Co. v. Weyerhaeuser Line,* 382 F.2d 711 (9th Cir. 1967), the effect of the 1972 amendments was to abolish the doctrine of seaworthiness for tort purposes and to apply land based principles of negligence to maritime personal injury claims. See, e. g., *Anuszewski v. Dynamic Mariners Corp., Panama,* 540 F.2d 757 (4th Cir. 1976); *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir. 1977). Thus, as before, liability under a contract theory should fall on the party "best situated to adopt preventive measures and thereby to reduce the likelihood of injury," *Italia Societa Per Azioni di Navigazione v. Oregon Stevedoring Co., Inc.,* 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964); *Lopez v. Oldendorf,* 545 F.2d 836 (2d Cir. 1976); *H & H Ship Service Co. v. Weyerhaeuser, supra;* however, for tort purposes traditional concepts of negligence will apply. See, e. g., *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092 (D.C.Md.1975).

Advance asserts in its brief in support of its motion for summary judgment that the effect of the 1972 amendments has been to place the primary responsibility for providing a safe place to work for longshoremen upon the stevedore-employer or independent contractor. It states at 7–8:

> "* * * [O]nce the stevedore is placed on notice that a defective condition exists on board the ship, it must take 'immediate, affirmative action to correct it, and to make the ship safe for its intended use.' [Citation omitted.] Still, even this duty is tempered somewhat as the stevedore or other independent contractor must have sufficient time between the discovery of the defect and the accident in order to correct the defect. [Citation omitted.]
>
> "As to the stevedore or independent contractor, then, it is clear that he is liable for injuries resulting from open and obvious conditions present at the time control of the area was taken and for defects arising while the area is under his control, provided he had sufficient time to remedy the condition."

Advance also states "that independent repairmen, on board ship for the purpose of carrying out repairs, have a similar duty to the ship and to those persons who may be lawfully found upon it. * * *. In other words, he owes the same duty as a stevedore in those areas over which he exercises control. [Citation omitted.]" (Brief at 8.)

Advance claims that the depositions and other materials on file in this action conclusively demonstrate that it did not have control over the area where the plaintiff fell prior to occurrence of the injury and that it did not have an opportunity to repair the ladder prior to that time. It asserts that it therefore cannot be liable to Lykes for indemnification or contribution in the event that Lykes is held liable to the plaintiff.[1] The Court finds that there exist genuine issues of material fact with regard, first, to whether or not Advance exercised sufficient control over the area in question to subject it to liability, and second, to whether or not it failed to carry out the repair of the ladder in a timely manner. Without deciding, therefore, under what circumstances precisely Advance would be required to indemnify Lykes for a judgment against it, summary judgment at this time is inappropriate.

It is not disputed that Advance was hired to make only certain specified repairs on the S.S. Jean Lykes and was not expected to look for and make general repairs. Nor is it disputed that Advance was informed of the damage to the ladder from which plaintiff later fell before the accident, and that it did not commence repairs on the ladder until after the accident. (Advance's reply brief at 5–6.)

Mr. Joseph Carriere, the port engineer for Lykes, testified at his deposition taken

---

1. Advance also claims that it had no duty to post warning signs or otherwise to prevent access to the ladder. Since summary judgment will be denied at this time on other grounds, the Court need not now consider whether or not Advance had such a duty.

on March 15, 1977, that he gave a copy of the list of items on the S.S. Jean Lykes needing repair to the Advance employees when they came on board the ship at approximately 8 or 9 o'clock A.M. on October 8, 1975. At approximately 10:15, while the Advance employees were engaged in repairing a ladder on the starboard side of hatch No. 2, the chief mate of the ship pointed out to Carriere the damage to the ladder on the port side of hatch No. 2, which is the ladder from which the plaintiff later fell. Carriere stated the following at his deposition:

"A. I got Moede from Advance Boiler—they were working on this missing ladder rung. They had all their equipment strung out and set up over there, and I took him there and showed him that, and he said, 'As soon as we finish repairs on this ladder, we'll go down and repair this other ladder,' and I told the ship's officer to post a sign, hang a sign there, that that was a damaged ladder below there.

" *    *    *.

"Q. Did he post a sign, the Chief Mate?

"A. I do not think he did." (Tr. at 40.)

Carriere further testified:

"Q. But you did tell Mr. Moede [of Advance] at that time to make the repairs?

"A. As soon as he finished making repairs to the ladder rung, the ladder on the forward starboard side of the Number 2, that's when the men—the men were presently working on that one and they—

"Q. Do you have any idea when his men did in fact finish making repairs to the other ladder in the Number 2 hold?

"A. It was after the accident because they were working on that ladder at the time of the accident." (Tr. at 43.)

Mr. Guy R. Moede, the foreman employed by Advance who was in charge of the Advance crew on the S.S. Jean Lykes on October 8, 1975, testified at his deposition taken on January 17, 1977:

"Q. Now as foreman, when you're given a list by the ship of repairs to do, what are the factors that you take into consideration in determining the priority of repair?

 *    *    *    *    *    *

"A. I go according to, like you said, if there's a person working in that hole [sic]. I stay away from that area and catch the work where there is nobody working in at the time.

"Q. Okay. So it's a matter of practical experience and common sense?

"A. Common sense more than anything.

"Q. More than the list that the ship owner gives you?

"A. I'll get done whatever is on that list, believe me, but I'm not going to go in order. I'll get it done wherever it's feasible." (Tr. at 39–41.)

Moede further testified:

"Q. Now did you—do you recall whether Joe [Carriere] listed the priorities of repair that he would want?

"A. No, I didn't—he didn't. He did not.

"Q. He would leave it up to you, your judgment?

"A. My discretion, yes." (Tr. at 43.)

Moede further testified:

"Q.  *    *    *.  Now you had how many men working on October 8th, six men besides yourself; is that right?

"A. One, two, three, four, five guys.

"Q. Five besides yourself?

"A. Yeah.

 *    *    *    *    *    *

"Q. How many men does your company employ or did they employ on October 7th and October 8th who were capable of doing the various pieces of work listed on these three pages, first three pages of Exhibit Group A?

"A. How many employees we have?

"Q. Yeah, that were capable of doing this particular work, whatever the work orders of these fourteen items—

"A. Well, I would say at least—we would have another ten men that

were capable of doing it." (Tr. at 65.)

Moede further testified:

"Q. So with the men working, the longshoremen working in these various holds, it's your opinion that you would not have been able to do this group of fourteen items sooner even if you had more men assigned, if you had two or three more men, say seven or eight or nine?

"A. See, you only have certain areas you can work. Now on the ladder, generally there's two men on it.

"Q. Two men working on it of your men?

"A. Yeah. For repairing. Okay. Now you can't shove four men on there and have two stand and watch the other two work. Just by putting more men on the job isn't going to get it done faster.

"Q. What if you had say four ladders to do work on and you had two men on each ladder. If you had eight men working with the appropriate skills, you could do all four ladders at the same time, couldn't you, unless there were longshoremen working in the, you know, in the hold or something; is that correct?

"A. Could be." (Tr. at 67–68.)

With regard to the issue of who had control over the area where the plaintiff fell when he fell, Advance claims that if anyone other than Lykes had control, it was Hansen or Dawes, who both had employees working in the area at the time. Advance asserts that it then had no employees in the immediate vicinity of the ladder.

The Court finds that the portions of depositions quoted to the Court by Advance and Lykes neither support nor contradict Advance's assertions, and there is no other evidentiary material on point presently in the record. In fact, it is entirely unclear at this time who was in the vicinity of the accident when it occurred, how many employees of the various defendants and third party defendants were there, and what they were doing. Furthermore, while Advance makes the assertion that there are no other witnesses able to testify as to control of the area, even were this assertion true, the issue of control is a factual issue and, because it is disputed, not one for the Court to resolve on a motion for summary judgment.

With regard to whether or not Advance had an opportunity to repair the ladder before the accident occurred, the Court finds that this question, which is a factual question, is also presently in dispute. As set forth above, Carriere testified that he told Moede about the defective condition of the ladder before the accident occurred, and at that time Advance employees were engaged in repairing a different ladder in the number 2 hold. Moede stated that two men only can work on a ladder at once, but Advance had five repairmen on the S.S. Jean Lykes on October 8, 1975. Thus, at a minimum, there exists a question of fact as to what three of those five men were doing at the time of the accident. It is clear from the present record that advance's employees did not commence work on the ladder prior to plaintiff's accident; it is not clear, however, why they did not do so.

For the foregoing reasons,

IT IS ORDERED that the motion of the third party defendant, Advance Boiler and Tank Company, for summary judgment is denied.